1  Jeffrey A. Cogan, Esq.
   Nevada Bar No. 4569
2  JEFFREY A. COGAN, ESQ., LTD.
   6900 Westcliff Drive, Suite 602
3  Las Vegas, Nevada  89145
   Telephone: (702) 474-4220
4  Facsimile:  (702) 474-4228
   E-mail: jeffrey@jeffreycogan.com
5  *Pro Hac Vice* Attorney for Plaintiffs
6

FILED ✓    LODGED ___
RECEIVED ___    COPY ___

SEP 2 8 2014

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY _____ DEPUTY

7              **UNITED STATES DISTRICT COURT**

8                  **DISTRICT OF ARIZONA**

9
   HELEN SCHARF, surviving spouse and            CASE NO.:    CV-14-08183-PCT-HRH
10 personal representative of estate of Gerald
   Scharf, deceased, KAREN BRIGHT and
11 RANDALL SCHARF, adult children of             **COMPLAINT**
   Gerald Scharf, deceased,
12
13              Plaintiffs,

   v.
14
   ARNALDO TRABUCCO, M.D.;
15 INSTITUTE OF UROLOGY, LLC;  PHC-
   FORT MOHAVE, INC. d.b.a. VALLEY
16 VIEW MEDICAL CENTER;  and DOES I
   through X,
17
18              Defendants.

19         COME NOW Plaintiffs, Helen Scharf, surviving spouse and personal representative of

20 the Estate of Gerald Scharf, deceased, Karen Bright and Randall Scharf, by and through their

21 attorney, Jeffrey A. Cogan, Esq., Ltd., and file this Complaint and hereby complain and allege

22 as follows:

23
24              **JURISDICTION AND VENUE**

25    1.    Plaintiff Helen Scharf is an individual residing in the State of California.

26    2.    Plaintiff Randi Scharf is an individual residing in the State of  Oregon.

27    3.    Plaintiff Karen Bright is an individual residing in the State of Oregon.

28

4.      Defendant Arnaldo Trabucco, M.D. is an individual residing on the State of Arizona.  Based upon information and belief, Arnaldo Trabucco, M.D. carried insurance for his actions that are alleged by Plaintiffs.

5.      Defendant the Institute of Urology is a Nevada Limited Liability Company and conducted business in Mohave County, State of Arizona.

6.      Defendant PHC-Fort Mohave, Inc. is an Arizona corporation and conducts business as Valley View Medical Center in Mohave County, State of Arizona.

7.      The true names of Defendants named herein as DOES I through X, whether individual, corporate, associate or otherwise, are presently unknown to Plaintiffs who therefore, sue said Defendants by such fictitious names; Plaintiff is informed and believes and thereon alleges that each of the Defendants so designated herein proximately caused and contributed to the damages herein alleged, and Plaintiffs will ask leave of Court to amend this Complaint to insert the true names and capacity of DOES I through X, when the same has been ascertained and to join such Defendants in this action.

8.      The claims at issue in this action exceed $75,000, exclusive of interest and costs.

9.      The subject matter of this action falls within the jurisdiction of this court by virtue of 28 U.S.C. § 1332(a)(2).

10.      Venue is proper in this court pursuant to 28 U.S.C. § 1391(a)(2) because a substantial part of the events giving rise to the claims occurred in the State of Arizona, that being the surgery performed on Gerald Scharf, deceased.

**FIRST CAUSE OF ACTION**
**(Survival Claim of Gerald Scharf)**

11.      At all times material herein, Gerald Scharf was a resident and citizen of the State of Arizona.

12.      Helen Scharf is the duly authorized personal representative of the estate of Gerald Scharf.

13.     At all times material herein, the Defendant Dr. Trabucco was a board certified urologist practicing in Fort Mohave, Arizona, who held himself out to the public as possessing expertise, skill and knowledge in providing urological surgical and postoperative care, particularly laparoscopic nephrectomies.

14.     At all times material herein, Defendant DOES I through X are persons who were present in the operating room, PACU or ICU who provided intraoperative care or advice and/or post-operative care to Gerald Scharf.

15.     At all times material herein, Defendant Valley View Medical Center (hereinafter referred to as "Valley View") was a professional corporation licensed in the State of Arizona and had its principal place of business in Fort Mohave, Arizona.  Valley View engaged in the business of operating a general hospital, employing or had on their staff, physicians, surgeons, urologists, anesthesiologists, physician assistants, nursing staff and other personnel to evaluate and treat patients with a variety of illnesses/surgical conditions.

16.     At all times material herein, the Defendant Dr. Trabucco and Does I through X were employees of, or agents of Valley View, were required to be licensed and/or privileged and/or credentialed by Valley View and were acting within the scope of their employment.

17.     On July 13, 2012, the Defendant Dr. Trabucco evaluated Gerald Scharf at the Institute of Urology in Fort Mohave, Arizona.  Dr. Trabucco confirmed there was a left upper pole renal mass that had been diagnosed several months previously by MRI.  Mr. Scharf had normal gait and station at the time of this examination.

18.     On August 6, 2012, Dr. Trabucco performed or had performed Extracorporeal Shock Wave Lithotripsy (hereinafter referred to as "ESWL") on Mr. Scharf's left kidney.

19.     On August 17, 2012, a left upper pole kidney biopsy was done.  Dr. Trabucco's postoperative impression was: "The patient will probably need a left upper partial pole nephrectomy versus total nephrectomy."  Pathology report showed a kidney stone.

20.     On August 21, 2012, Dr. Trabucco ordered an open left radical nephrectomy with some formal lymph node dissection.  Dr. Trabucco's note states: "I explained the various possible complications of the surgical procedure.  These included perforation of the colon, a possible temporary or permanent colostomy, sudden and chronic blood loss during surgery, possible ureteral injury, swelling of the abdomen post-operatively, post-operative ileus, post-operative infection of the wound, thrombophlebitis, incisional hernia and wound separation.  I explained the possibility of lung injury, liver/spleen injury, and large and small bowel injury."  The surgery was to be scheduled in two weeks.

21.     On September 11, 2012, Dr. Trabucco met with Gerald Scharf to discuss kidney removal.  Dr. Trabucco's note states: "Nephrectomy (laparoscopic).  I explained the various possible complications of this surgical procedure.  These included perforation of the colon, a possible temporary or permanent colostomy, sudden and chronic blood loss during surgery, possible ureteral injury, conversion to an open procedure, swelling of the abdomen post-operatively, post-operative ileus, post-operative infection of the wound, thrombophlebitis, incisional hernia and wound separation.  I explained the possibility of lung injury, liver/spleen injury and large and small bowel injury.  Procedures – GLEP (Greenlight Laser) 52649 – ordered 9/11/12.  This patient has been informed that he requires a Greenlight Laser Enucleation of the Prostate (GLEP).  The specific risks and complications were discussed today in detail.  These include but are not limited to continued urinary retention or difficulty urinating; bleeding; urinary incontinence; erectile dysfunction; injury to the bladder; urethra or rectum.  Any and all questions were answered and the post-operative course was reviewed. 1 Fiber.  A Greenlight Laser packet was given to patient with instructions to read

educational materials and watch DVD.  Procedures – Nephrectomy (open) ordered 9/11/12.

Left Nephrectomy (open).  I explained the various possible complications of this surgical

procedure, these include perforations of the colon, a possible temporary or permanent

colostomy, sudden and chronic blood loss during surgery, possible ureteral injury, swelling of

the abdomen post-operatively, post-operative ileus, post-operative infection of the wound,

thrombophlebitis, incisional hernia and wound separation.  I explained the possibility of lung

injury, liver/spleen injury and large and small bowel injury."

     22.     On September 14, 2012, the Dr. Trabucco performed a surgery history and

physical on Gerald Scharf.  His note states:  "… Physical Exam/Impression …

Musculoskeletal:  Normal gait and station, normal inspection of digits and nails; normal

structure and appearance of the head, neck, spine, ribs, pelvis and extremities; full range of

motion of the head, neck, spine, ribs, pelvis and extremities; normal stability, muscle strength

and tone of the head, neck, spine, ribs, pelvis and extremities … Ordered, Procedures –

Nephrectomy (Laparoscopic) - Ordered 9/14/12.  Possible laparoscopic left partial

nephrectomy conversion to Open/total left nepherectomy.  Procedures – Nephrectomy (Open)

– Ordered 9/14/12.  Nephrectomy (Open).  I explained the various possible complications of

this surgical procedure.  These included perforations of the colon, a possible temporary or

permanent colostomy, sudden and chronic blood loss during surgery, possible ureteral injury,

swelling of the abdomen post-operatively, post-operative ileus, post-operative infection of the

wound, thrombophlebitis, incisional hernia, and wound separation.  I explained the possibility

of lung injury, liver/spleen injury, and large and small bowel injury.  Procedures – GLEP

(Greenlight Laser) 52649 – Ordered 9/14/12.  The patient has been informed that he requires a

Greenlight Laser Enucleation of the Prostate (GLEP).  The specific risks and complications

were discussed today in detail.  These include but are not limited to: continued urinary

retention or difficulty urinating; bleeding; urinary incontinence; erectile dysfunction; injury to

the bladder; urethra or rectum.  Any and all questions were answered and the post-operative course was reviewed. 1 Fiber."

23.     Surgery was performed on September 24, 2012:

Anesthesia start:  8:22

In room: 8:32

Procedure start: 9:25

Out: 18:05

Procedure end: 17:55

Anesthesia end: 18:10

Comment: "Patient was seen by Dr. Trabucco and Dr. Basta pre-op holding area. Patient has epidural catheter in place (sic) inserted by Dr. Basta pre-op...."

Personnel in OR:

Leona Delia, RN Circulator

Kyoko Kadosono-Terrell, RN Circulator

Darin Fennern, Surgical Tech 2

Kenneth Pfefier, Surgical Tech 1

Jim Hunt, Rep from Covidien;  In Time: 8:32; Out Time: 18:05

Thad Snook, Rep from Applied; In Time: 8:32; Out Time: 18:05

Randy Steward, Relief Surgical Tech

Richard Johnson, Surgical Tech 1

Gretchen Moran, RN Relief Circulator

Operative note states:

Preoperative Diagnosis:  Left renal tumor.

Postoperative Diagnosis: left renal tumor.

Surgeon: Arnaldo Trabucco, M.D.

Anesthesiologist:  Dr. Basta with an epidural and general.

Operation Performed:  Laparoscopic left radical nephrectomy.

Intraoperative Complications:  None.

Blood loss:  100 mL.

Specimens: left renal tumor.

Findings:  Aborization of left renal tumor with multiple lumbar and renal aberrant vessels.

Narrative Report:  Once the patient was draped and prepped in the usual operative fashion, a 2 cm incision was made in the umbilical area and supraumbilical area for hand-assisted laparoscopic nephrectomy. Trocar site was placed on the left side in order to allow for trocar introduction for a fan retractor. The patient had a SILS Covidien port placed, 3 ports, in the umbilical area while hand-assisted Alexis GelPort was placed in the supraumbilical area. The patient had laparoscopic lysis of adhesions of some bowel components first performed and then the line of Toldt was then taken down with a Harmonic scalpel. The Harmonic was then used to also take the area of the left splenocolic area and the spleen was markedly adhesed to the colon and its surrounding attachments for unknown etiology. Once the spleen was taken down atraumatically from the renal bed hilum, from the renal bed and the colon, the colon was then transposed medially in order to allow access to the retroperitoneum and Dartos fascia. The Dartos fascia was then inspected. There was a large mass superior portion of the kidney and this was felt to be larger than what was found by the CT scan. There was a tremendous amount of fibrosis around the area with a marked desmoplastic reaction possibly related to his prior ureteroscopy. The patient did have a stent

which was palpable, and the stent was not removed during this operative

intervention but was transected. The patient at this point had first the lateral

aspects of the renal bed taken down. There was some arborization on the superior

left lateral aspect of the tumor. These were taken down and these were ligated

with 5 mm vessel staples through the trocar site and at this point the inferior

aspect of the gonadal was then traced superiorly to its attachment to the renal

vein. It was a very large renal vein.  The gonadal vein was transected free with

some clips and hemostatic absorbable clips and at this point these were then

transected in order to allow for appropriate ligation in order to gain access to the

left renal artery. It was impossible to get access to the left renal artery strictly by a

mass ligature due to the large size of the left renal artery. In fact, there were

multiple lumbar vessels coming from this locality. Therefore, the procedure had

been taken as close to the kidney as possible to prevent any possible ischemic

issues most likely related to the lumbars and also to allow for proper extirpation

of the tumor. A partial nephrectomy was not able to be done due to the fact that

there were multiple vessels posteriorly, medially, laterally and inferiorly not

allowing for appropriate vascular control during the operative intervention.

Therefore, a left radical nephrectomy was done knowing that the majority of the

function was coming from the right contralateral kidney, 69%. The patient at this

point had the left renal vein identified. Left adrenal vein was ligated with clips

and ligature. The patient had the adrenal preserved during the procedure as it did

not appear to be involved and the adrenal appeared to be palpably normal. The

left renal bed, the hilum was involved with the marked arborization of multiple

vessels coming from the left renal artery and also an aberrant vessel from the left

aorta. The left renal vein was identified. In order to get access to the left renal

artery, the left renal vein had to be transected then using a Covidien stapling device that cuts, the vascular suture was then placed over the left renal vein, fired and transected the left renal vein in order to gain access to the left renal artery. The left renal artery was found to have one to three lumbar vessels immediately posteriorly. These were preserved and then the area as for medial to the kidney surface was then transected with a large 60 cm cutting vascular stapling device. The patient had the renal artery transected and this was then taken off its attachments to the medial aspect; however, there was a vessel that was immediately posterior as well, a vessel and a vein. These were stapled with again another vessel staple. Once this was transected, attempt to remove the kidney was performed but again there was another posterior artery and vein that was noted on the renal surface. This was then transected with another vascular vessel stapler and the tumor along with the kidney was then able to be removed. Once the ureter was transected with a LigaSure, the patient had the vascular bed inspected before removal of the tumor, which was then placed in a device to capture and remove. The tumor along with the kidney was sent for permanent section. At this point, the renal vascular bed was inspected. There was no bleeding. There was approximately 100 mL blood loss during the entire procedure. Of note, during the stapling of the renal vascular hilum, there were multiple atherosclerotic plaques that were noted during the operative intervention. Several staplers were used in order to gain access to this area in order to allow for proper control of bleeding. Bleeding was well controlled and well prepared during the entire operative intervention. The patient, at this point, had the left renal bed visualized. There was no bleeding, no oozing. The renal bed was completely dry. There was no evidence of any oozing or bleeding, no active bleeding, some snow was used and

anti thrombolytic agents were used in the renal bed. The patient, at this point, had attempted visualization of the left lower ureter to remove the stent; however, due to the marked fibrosis of the retroperitoneum, it was impossible to identify this. Therefore, at this point, it was felt that due to the fact that the patient would be coming back after 48 hours for a GreenLight laser enucleation of prostate that this would be removed from below. Therefore, the stent was left in an amputated state in the left ureter. The patient, at this point, had visual inspection laparoscopically and with decompression after pneumatic control was provided to visualize the retroperitoneum and there was no evidence of any bleeding. The patient tolerated the procedure well. The colon was then retroflected back to its normal anatomical position and the procedure was then terminated by removal of the GelPort, the SILS port and closure of the anterior and posterior rectus abdominis with 0 PDS, double arm, in a running, continuous, interlocking fashion. A double layer was used for this procedure, the level of each incision for the hand-assist portion and the GelPort and the laparoscopic port. The sites where the trocars were introduced were closed with Prolene 2-0 and then Insorb was used for the remaining portion of the including and Steri-strips. The patient had dressing placed. There was no need for any drains. The patient tolerated the procedure well. There were no apparent complications. The patient was then transferred back to the recovery room in excellent condition after moving the patient over to the gurney atraumatically. Of note, the patient had the specimen sent in formalin to pathology for permanent section and final pathologic confirmation and the superior portion of the stent was sent to pathology along with the specimen. The specimen was not opened during the procedure in order to prevent any potential for a tumor spillage.

Comment:  11:32 –Dr. Azher came in the room to assist.  11:35 – Dr. Serbine

relief for Dr. Basta til 11:56.

24.      The Pathology Report showed Multilocular renal cell carcinoma confined to the

left kidney.

25.      On 9/24/12 at 18:45:  Patient received from PACU.  Patient sleepy but awake,

Ox3 cooperative, weakly moves toes, will monitor closely. PMW2000 epidural off, no other

changes to note.  On 9/24/12, at 20:00, Report received from Donna McCorkle, PACU RN.

No signs or symptoms of neurological deficit, all peripheral pulses strong.  On 9/24/12 at

20:30, patient c/o pain at 1/10.  At 20:50 patient c/o pain at "100/10" level, dilauded IV

pending per pharmacy.  Dr. Basta notified, see orders obtained.  9/24/12 at 20:50 Dr. Basta

Orders: increase epidural rate to 8 ml/hr TORB+V.

26.      On 9/24/12 at 21:35:  Patient without sensation or movement in bilateral lower

extremities – epidural off.

27.      On 9/24/12 at 21:45:  Dr. Basta informed patient with no movement or

sensation in lower extremities, epidural off.  See orders received.  At 21:45 Dr. Basta orders:

hold epidural drip for now if regains sensation/movement in lower extremities may resume at

4 ml/hr, if no change in 1 hr. call me, TORB+V.  At 22:37 epidural lower thoracic.  At 22:47:

Initial assessment for shift, epidural lower thoracic.

28.      On 9/24/12 at 23:15:  Dr. Basta calls, patient continues with no movement or

sensation to bilateral, lower extremities.  See orders received. 23:15:  Dr. Basta orders: hold

epidural drip, use prn for pain control TORB+V.

29.      On 9/24/12 at 23:30:  Dr. Trabucco paged and notified of patient UOP <10 last

4 hours.  New orders received.   23:30: Dr. Trabucco orders: 500 ml NS Bolus I.V. – Now x 1

BMP, BNP now call if abnormal, consult nephrology in am, ↓UOP, TORB+V.

30.     On 9/25/12 at 1:50:  Dr. Basta calls.  No changes, patient continues to deny sensation and movement to bilateral, lower extremities.

31.     On 9/25/12 at 1:55:  Dr. Trabucco paged regarding patient status and UOP.

32.     On 9/25/12 at 2:00:  Dr. Basta at bedside, removes epidural line.

33.     On 9/25/12 at 2:08:  Dr. Trabucco paged.

34.     On 9/25/12 at 2:25:  Dr. Basta ordered:  stat MRI w/o contrast of lower spine, stat read pt without movement, sensation, bilat LE 6 hours post epidural.

35.     On 9/25/12 at 2:45:  Dr. Basta speaks with Dr. Trabucco.  See orders written. Orders: 1) Cancel MRI 2) stat CT scan lumbar, thoracic without contrast 3) 300 ml bolus NS 4) Lasix 10 mg IV x 1 5) chest CT.

36.     On 9/25/12 at 2:58:  Patient to CT via bed with portable monitor and staff.

37.     On 9/25/12 at 3:35:  Patient return to ICU 201 via bed as previously noted.  CT's complete.

38.     On 9/25/12 at 3:39:  Patient medicated for pain.

39.     On 9/25/12 at 3:41:  Patient continues to deny sensation and movement in bilateral lower extremities – No UOP.  IV bolus in process and ordered Lasix given.

40.     On 9/25/12 at 3:52:  Epidural DCD, verbalizes adequate relief of pain PCA.

41.     On 9/25/12 at 3:58:  Continues with no UOP and no sensation or movement in lower extremities bilateral.  Dr. Basta at bedside, epidural removed.  Dr. Trabucco return call from page pending – PMW- 0357 – no change to note at present PMW –CP Wrights.

42.     On 9/25/12 at 5:35:  No changes to note in assessment.  Patient continues without movement or sensation bilateral lower extremities.

43.     On 9/25/12 at 6:50:  Report given to Danny Johnson, RN.

44.     On 9/25/12, a CT of the thoracic spine was performed.  An MR was recommended.  The report was dictated at 10:19.

45.     CT of the lumbar spine dictated 9/25/12 at 10:19. "Follow-up MR scan may be helpful.

46.     On 9/25/12, a radiology report was dictated at 11:41 – the clinical indications for the portable chest x-ray was paralysis, post operative nephrectomy. The radiology procedure had been performed on 9/24/12

47.     On 9/25/12 at 12:17:  12:00 patient to nuclear medicine for test.  Not performed. Reason:  Other.

48.     On 9/25/12, Anees Arshad, M.D. performed an ICU Consultation.  His note states that Gerard Scharf was fully alert, aware, oriented x 3; however slightly sleepy.  Moves all extremities.  No focal deficit appreciated.

49.     Right renal ultrasound performed on 9/25/12.  Clinical indications: Post operative status post left nephrectomy. No urine output.

50.     On 9/25/12 at 16:34, Almutaz Kartoumah, M.D. performed an ICU consultation. His note states:  "Right after procedure, the patient stopped making any urine and he lost feeling below the waist.  His impression was:  1. Acute renal failure, oliguria, most probably _____ to hemodynamic changes plus/minus interruption of blood supply of the remaining kidney, ? from the surgery."   The report was dictated at 16:34 on 9/25/12.

51.     An arterial Duplex Color Flow Doppler imaging of the lower extremities reported at 12:14 p.m. on 9/25/12 for lower extremity paralyses indicated... generalized low monophasic waveforms through  body lower extremities which would suggest a hemodynamically significantly flow limiting stenosis or occlusion at the bifurcation of the abdominal aorta or iliac arteries.

52.     On 9/25/12 at 14:29, a CT of the chest was performed.  The clinical indication was: "paralysis, post operative nephrectomy."

53.    On 9/25/12, Radionuclide renal scan.  Report dictated at 14:56.  "Non-visualization of the right kidney."

The radionuclide renal scan done on 9/25/12 because of lower extremity paralysis, post-operative nephrectomy, abnormal renal ultrasound indicated, "non-visualization of the right kidney.  Dynamic flow images demonstrate no perfusion to the right kidney.  Sequential static images demonstrate non-visualization of the right kidney this may indicate renal vascular occlusion."

54.    <u>Discharge summary</u>:  Dictated at 14:38 on 9/25/14.

Principal Diagnoses Responsible For The Patient's Hospitalization: Left renal tumor.

Principal Procedures Performed: Left laparoscopy radical nephrectomy.

Other Diagnoses:

1.    Anuria.

2.    Hemiparesis.

3.    Cold inferior extremities and trash syndrome.

Hospitalization:  The patient is a very pleasant, 81-year-old white male who had presented with a left renal tumor, upper pole, for which the patient underwent preoperatively a renal nuclear scan revealing that the majority of the function of the right kidney, 69% was provided on the right side, 31 on the left. The patient at this point with a negative metastatic evaluation had undergone a left radical nephrectomy. At left radical nephrectomy was found intraoperatively to have a complex arborization of lumbar vessels from the renal bed tumor to the retroperitoneum. The tumor, along with the kidney of the left side was removed with only 100 mL blood loss. The patient has been observed in the ICU, was found to have no urine output despite fluid challenges and Lasix and was

developing paraplegia despite the fact that the drip was removed along with the anesthetic for an epidural.

The patient on physical examination this morning was found to have cold inferior extremities bilaterally with no pedal pulses. The patient was anuric and there was hemiparesis of both inferior extremities with loss of sensation from the thigh down. The patient had an indwelling Foley catheter. The patient had a renal nuclear scan, results are still pending at the present time due to the severity of the situation and the complexity of the situation from a trash syndrome which was apparently involving the contralateral kidney, inferior extremities and possibly the arteries going to the spine from multiple atherosclerotic plaques, the patient will need to be evaluated and treated in an acute care facility that will be able to manage this patient's complex postoperative care. Therefore, Sunrise Hospital was chosen for this. The patient is now immediately transported with attentive interest to have a spinal angiogram performed as well as he will need dialysis as well as any form of revascularization treatment to the affected organs. Due to the fact that the patient's organs have been affected on a multilevel nature, the complexity of the care is not available to be treated over at Valley View Medical Center necessitating transport. This patient is transferred to Sunrise Hospital for a higher level of care where a neurosurgical team will be available and possible revascularization of either inferior extremity spinal arteries or contralateral kidney will be in order.

55.     On 9/25/12, Gerald Scharf was transferred by ambulance to Sunrise Hospital in Las Vegas, Nevada.

56.     On 9/25/12, History and Physical Exam done at Sunrise Hospital indicated Gerald Scharf had been admitted with a diagnosis of possible aortic occlusion.   He was awake at time of admission.  He was in renal failure and needed emergency dialysis.

57.     On 9/25/12, an abdominal aortogram was done.

FINDINGS: The visualized portion of the distal thoracic aorta is normal in course and caliber flowing into a normal-appearing proximal abdominal aorta. There is normal flow into the celiac and superior mesenteric arteries. Those vessels demonstrate normal branching. However, just below the superior mesenteric artery there is complete total occlusion of the abdominal aorta. I would estimate the length of the total aortic occlusion is at least 5 cm in length. This occlusion is at the level of the left renal artery where the patient had a recent nephrectomy and is also at the level of the right renal artery. There is no flow seen into a right renal artery or to the right kidney at all. Some surgical clips are seen in the left renal fossa and there is also a distal ureteral stent in place on the left. The distal abdominal aorta reconstitutes via some small lumbar artery collaterals and also via a patent arch of Riolan and a patent marginal artery of Drummond which reconstitute the inferior mesenteric artery flowing a retrograde fashion to faintly fill the distal abdominal aorta. Patent faint flow is then demonstrated in the distal abdominal aorta flowing through patent common iliac, internal iliac, and external iliac arteries bilaterally. The common femoral arteries are patent and flow into patent profunda femoris and superficial femoral arteries bilaterally and continue to flow into patent popliteal arteries bilaterally. Below the knees, the tibial vessels are not well demonstrated on this study, likely due to poor arterial inflow. These findings were discussed with Dr. Jahangir by phone.

IMPRESSION: 5 cm complete and total occlusion of the abdominal

aorta over 5 cm in length at the level of the renal arteries. Status post left nephrectomy. No flow into the right renal artery or right kidney at all. Normal flow is seen in the celiac and superior mesenteric arteries. Faint reconstituted flow is seen in the distal abdominal aorta and runoff vessels. No significant arterial flow visualized on this study below the level of the knees, likely due to the poor arterial inflow.

58.   On 9/25/12, an emergency cardiovascular surgical consultation was performed. The report was dictated at 00:00:48 on 9/26/12.

PHYSICAL EXAMINATION:

This is an elderly white male who is conversant but lethargic. He has surgical dressings on his abdomen. He is insensate below the umbilicus. He is unable to move either leg. Both legs are cool to the touch with no palpable pedal pulses.

ASSESSMENT AND PLAN:

The patient with acute aortic occlusion after laparoscopic nephrectomy. The remaining (right) kidney has infarcted. He most likely has a spinal cord infarct as well. His legs are threatened. He needs emergency revascularization. His potassium level currently is 6.9 and he is anuric. I have spoken with the patient's family in detail. I have explained the gravity of the situation and the rationale for surgery. No guarantees have been given. I have explained that he must be dialyzed prior to surgery, otherwise he will die intraoperatively. With an axillary bifemoral bypass, I plan to restore blood flow to the lower extremities and retrograde to the distal aorta, but his renal failure is likely permanent and his spinal cord injury is also likely permanent.

He runs the risk reperfusion-related complications, such as hyperkalemia and acidosis as well as compartment syndrome. He most likely will be intubated postop. There is real chance of mortality. All these facts have been made clear. We are waiting for dialysis to be completed. Once completed, I will emergently proceed to the operating room.

59.   REPORT NAME: OPERATIVE REPORT

DATE OF PROCEDURE: 09/26/2012

PREOPERATIVE DIAGNOSES: Acute aortic occlusion status post laparoscopic nephrectomy, bilateral lower extremity ischemia with threatened lower extremities, paraplegia, renal failure.

POSTOPERATIVE DIAGNOSES: Acute aortic occlusion status post laparoscopic nephrectomy, bilateral lower extremity ischemia with threatened lower extremities, paraplegia, renal failure.

PROCEDURE PERFORMED: Emergency right axillary bifemoral bypass with 8-mm ringed PTFE graft.

SURGEON: Nauman Jahangir, MD

ANESTHESIA: General.

ANESTHESIOLOGIST: Dr. Jon Hailing.

INDICATIONS: This 81-year-old man was transferred from Fort Mohave, Arizona. On Monday he underwent a laparoscopic nephrectomy. Postoperatively, he was found to have absent lower extremity pulses and was anuric. He underwent CT scan and renal perfusion scan which revealed no blood flow to the right kidney. He was transferred to Sunrise Hospital late last night where he underwent aortogram with runoff done through the brachial approach. His aorta is completely occluded just distal to the superior mesenteric artery. There is no

blood flow to the right kidney. The left kidney is surgically absent. There is

collateral flow through the mesentery collaterals with faint reconstitution of the

distal aorta and iliac vessels. He is paraplegic and insensate below the umbilicus.

He is completely anuric. His potassium was 6.9 last night. Therefore, he was

emergently dialyzed and then brought to the operating room immediately

thereafter for lower extremity revascularization with the understanding that this is

a salvage procedure and is high risk. No guarantees have been given. The

likelihood of his kidneys and urologic function recovering is essentially none.

OPERATIVE FINDINGS: The right axillary artery was used, which was soft and

had excellent inflow. The femoral vessels were soft as well. There was no

thrombus in the vessels. Inflow from the native vessel was sluggish.   At the end

of the procedure, the patient had satisfactory posterior tibial Doppler signals

bilaterally. Overall prognosis, however, remains guarded.

DETAILS OF THE PROCEDURE:     Informed consent signed. The patient was

emergently brought to the operating room and laid in supine position on the

operating table. After administration of general anesthesia by the

anesthesiologist, preoperative antibiotics were administered and invasive

monitoring lines were placed. The patient was prepped from the chin to the toes

with ChloraPrep and draped in sterile fashion. A right infraclavicular incision was

made and the right axillary artery was carefully dissected out and controlled with

vessel loops. Bilateral groin incisions were made and the common superficial and

deep femoral arteries on both sides were dissected out and controlled with vessel

loops. An 8-mm bifurcated ringed PTFE graft was then tunneled subcutaneously

between the infraclavicular and right groin incision and then subcutaneously

between both groin incisions, ensuring correct orientation. The patient was given

5000 units of heparin intravenously and, after allowing it to circulate, the axillary

vessels were occluded with vessel loops. A longitudinal arteriotomy was made.

The graft was spatulated and anastomosed in end-to-side fashion with 6-0 Prolene

suture. After de-airing, flow was restored to the right arm. The graft had

excellent distal and was clamped bilaterally. The right femoral vessels

were occluded with vessel loops. A longitudinal arteriotomy was made. There

was no thrombus inside the vessel. Inflow was checked and there was sluggish

inflow bleeding noted. The graft was spatulated and anastomosed in end-to-side

fashion with 6-0 Prolene suture. After deairing and after administration of

intravenous sodium bicarbonate, flow was restored to the right leg, which was

tolerated well by the patient. In a similar fashion, the left side of the graft was

spatulated and, once again, after making a longitudinal arteriotomy in the

common femoral artery, the graft was anastomosed in end-to-side fashion with 6-

0 Prolene suture. After deairing, flow was restored to the left leg as well. Once

again, this was tolerated well by the patient, with no significant hemodynamic

instability. No protamine was administered. Doppler signals were checked in

both feet and found to be present in both posterior tibial arteries. Incisions were

irrigated with antibiotic solution and closed in layers of Vicryl. Dry sterile

dressings were applied. The patient was extubated in the operating room and

transferred to the recovery room in stable condition. There were no intraoperative

complications.

Dictated by: NAUMAN JAHANGIR MD

DD: 09/26/2012 08:00:10 DT: 09/26/2012 08:54:26

60.     On September 27, 2012 Gerald Scharf died.  His death certificate lists the immediate cause of death as acute aortic occlusion, renal failure and respiratory failure.

61.     The autopsy report demonstrated the presence of synthetic material outside of the aorta at the level of the left renal artery, left nephrectomy surgical site.

62.     Autopsy Report:

| FINAL HOSPITAL ADMISSION: | DEATH DATE/TIME: | PLACE OF DEATH: | AUTOPSY DATE: |
|---|---|---|---|
| 09/27/2012 | 09/27/2012 12:38 AM | SUNRISE HOSPITAL | 09/28/2012 |

RESTRICTIONS:  NONE

PROSECTOR:  DAVID R COON, M.D. ; MYRANDA TISCHER, PA (ASCP)

EMBALMED:  NO

PATIENT'S PHYSICIAN(S): JAHANGER, NAUMAN, M.D.; RASHID BASHIR Q., M.D.

THIS 81-YEAR-OLD MALE WAS TRANSFERRED TO SUNRISE HOSPITAL ON 9/25/2012 FROM FORT MOHAVE, STATUS-POST LEFT LAPAROSCOPIC NEPHRECTOMY ON 9/24/2012.  HE PRESENTED WITH POST-OPERATIVE HEMIPARALYSIS, AND ANURIA.  HE WAS EVALUATED AT SUNRISE FOR POSSIBLE AORTIC OCCLUSION AND RIGHT RENAL INSUFFICIENCY.  HIS PAST MEDICAL HISTORY IS SIGNIFICANT FOR A LEFT RENAL MASS, BENIGN PROSTATIC HYPERTROPHY AND HYPERTENSION.

| CARDIOVASCULAR SYSTEM: | HEART (360 GRAMS) .<br>-     LEFT CORONARY ARTERY, FOCAL 40% OCCLUSION.<br>-     FOCAL SUBENDOCARDIAL SCARRING, LEFT VENTRICLE.<br>-     SEVERE CALCIFIC AORTIC ATHEROSCLEROSIS, PRIMARILY AT THE AORTIC ARCH AND ABDOMINAL AORTA AT THE LEVEL OF THE BRANCHING OF THE RENAL ARTERIES WITH SMALL ADHERENT THROMBUS.<br>-     RIGHT AXILLARY TO BILATERAL FEMORAL BYPASS GRAFT IN PLACE |
|---|---|

| RESPIRATORY SYSTEM: | LUNG (RIGHT 465 GRAMS, LEFT 440 GRAMS). <br> - FOCAL RIGHT PLEURAL ADHESIONS. <br> - LEFT PLEURAL EFFUSION (900 CC SEROUS SANGUINEOUS FLUID). <br> - NO PULMONARY EMBOLI IDENTIFIED. |
|---|---|
| HEPATOBILIARY SYSTEM: | LIVER (1700 GRAMS). <br> - NO GROSS PATHOLOGIC FINDINGS. |
| GASTROINTESTINAL SYSTEM: | NO GROSS PATHOLOGIC FINDINGS. |
| GENITOURINARY SYSTEM: | RIGHT KIDNEY (180 GRAMS). <br> - DIFFUSE DUSKY RED BROWN RIGHT RENAL PARENCHYMA. <br> STATUS-POST LEFT NEPHRECTOMY. <br> - SYNTHETIC MATERIAL IDENTIFIED OUTSIDE OF THE AORTA AT THE LEVEL OF THE LEFT RENAL ARTERY, LEFT NEPHRECTOMY SURGICAL SITE. |
| LYMPHOVESICULAR SYSTEM: | SPLEEN (165 GRAMS). <br> - NO GROSS PATHOLOGIC FINDINGS. |
| ENDOCRINE SYSTEM: | UNREMARKABLE THYROID. <br> UNREMARKABLE RIGHT ADRENAL GLAND (13 GRAMS). |
| CENTRAL NERVOUS SYSTEM: | BRAIN (1320 GRAMS). <br> - ABUNDANT CHOROID PLEXI. <br> - FOCAL SLIGHT ATROPHY OF THE CEREBELLUM FOLIA. |

NOTE: The provisional diagnoses are made following gross dissection at autopsy; with further histologic and other pertinent examination they may be altered.

Dictated by: Coon, David R MD, PhD

* INTERPRETATION PERFORMED AT:
SUNRISE HOSPITAL 3186 MARYLAND PARKWAY LAS VEGAS, NV 89109

Final: Coon, David R MD, PhD  * 9/28/12  by COODAV

** End of Report **

63.     Gerald Scharf was entitled to the same quality of care that he would have received from surgeons, urologists, anesthesiologists, physicians, nurses, clinics and hospitals anywhere in the United States.

64.     The standards of care applicable to Dr. Trabucco are the same standards of care that would apply to other urological physicians providing preoperative, operative and postoperative care anywhere in the United States.

65.     The standard of care applicable to Defendant Institute of Urology, LLC and its employees is the same standard of care applicable to other health care facilities providing diagnostic and urological care in any other location in the United States. The Institute of Urology, LLC is vicariously liable for the conduct of its employees.

66.     The standard of care application to Defendant Valley View Medical Center and its employees is the same standard of care applicable to other health care facilities providing diagnostic urological surgery and postoperative care in any other location in the United States. Valley View Medical Center is vicariously liable for the conduct of its employees and agents.

67.     Defendant, Arnaldo Trabucco, M.D. failed to possess and/or exercise the education, training and skill ordinarily possessed and exercised by other board certified urologists practicing in the United States in the surgical and postoperative care he provided to Gerald Scharf.

68.     Defendants DOES I through X failed to possess and/or exercised the education, training and skill ordinarily possessed and exercised by care they provided to Gerald Scharf.

69.     The standards of care applicable to Dr. Trabucco include, but are not limited to:

    a.    To perform the safest procedure that gets the job done.

b. To recognize and treat intraoperative and post operative complications in a timely manner.

c. To tell the patient the important facts, including all significant risks and complications of the procedures he intends to perform, so the patient can make an intelligent decision.

d. To have adequate training and experience in performing the procedures he proposes to perform.

e. To have training, experience and current knowledge to perform the care to Mr. Scharf.

f. To perform procedures at a facility properly equipped and having personnel to manage known risks and complications of the procedures he intends to perform.

g. Identify structures such as blood vessels before cutting or ligating them.

h. Convert from a laparoscopic to open procedure if the surgeon is unable to adequately identify blood vessels and other structures before cutting or ligating.

i. Recognize and repair injuries to the blood vessels and other structures during a surgical procedure.

j. Ask for help if the surgeon lacks experience or has concerns about diagnosis or treatment, preoperatively, intraoperatively and post-operatively.

k. To identify and treat cause(s) of abnormal postoperative symptoms.

l. Put the patient's interests first.

m. To consult with specialists better trained to evaluate and treat patient if the surgeon has questions or concerns preoperatively, intraoperatively or post-operatively.

n.   A surgeon is never allowed to needlessly endanger his/her patient.

70.   The negligence of the Dr. Trabucco, includes, but is not limited to:

a.   Failure to do a thorough evaluation of Gerald Scharf prior to his September 24, 2012 surgery.

b.   Failure to obtain informed consent required by accepted standards of care.

c.   Performing the procedure at Valley View Medical Center.

d.   Injuring blood vessels and other structures associated with Gerald Scharf's right kidney and spinal cord.

e.   Failure to timely recognize and treat Gerald Scharf's spinal and right kidney injuries.

f.   Failure to obtain an MRI/MRA of Gerald Scharf's spine and right kidney after the September 24, 2012 surgery.

g.   Failure to timely recognize Gerald Scharf's signs and symptoms of developing spinal cord injury and kidney failure after the September 24, 2012 surgery;

h.   Failure to timely recommend or obtain diagnostic tests, including radiological studies to determine the cause of Gerald Scharf's lower extremity loss of sensation/paralysis and kidney failure following the September 24, 2012 surgery;

i.   Failure to recognize the need for additional urological or vascular assistance during the procedure;

j.   Failure to convert to an open procedure in a timely manner;

k.   Failure to protect Gerald Scharf from injury during surgery;

l.   Reckless disregard for the rights of Mr. Scharf;

m.   Permitting manufacturer reps in operating room;

n.   Failure to timely transfer Gerald Scharf to Sunrise Hospital.

o.   Other failures to conform to accepted standards of care.

71.   Defendant, Institute of Urology, LLC, is vicariously responsible for the conduct of its employees and agents.

72.   The negligence of Defendant, Valley View Medical Center includes, but is not limited to:

    a.   Failure to protect Gerald Scharf from needless injury during and after surgery

    b.   Failure to timely diagnose Gerald Scharf's spinal and right kidney injury, intra and postoperatively.

    c.   Failure to timely recognize Gerald Scharf's signs and symptoms of developing spinal cord injury and right kidney injury;

    d.   Failure to timely recommend or perform diagnostic tests, including appropriate radiological studies of Gerald Scharf's spine and right kidney; and

    e.   Failure to protect Gerald Scharf from injury.

    f.   Failure to recognize the surgery was not proceeding expeditiously.

    g.   Permitting manufacturer's representatives in OR.

    h.   Failure to obtain appropriate consents.

    i.   Failure to timely transfer Gerald Scharf to Sunrise Hospital.

    j.   Granting privileges and credentials to Dr. Trabucco to perform laparoscopic nephrectomy.

    k.   Permitting laparoscopic nephrectomy to be performed at Valley View Medical Center;

    l.   Failure to recognize Mr. Scharf's blood vessels and other structures being injured and/or had been injured, particularly to the spinal cord and right kidney;

    m.   Failure to provide appropriate postoperative care;

    n.   Failure to consult with appropriate specialists;

o.  Reckless disregard for the rights of Mr. Scharf;

p.  Failure to timely recognize Gerald Scharf's signs and symptoms of developing spinal cord injury and right kidney injury; and

q.  Failure to timely transfer Gerald Scharf to Sunrise Hospital.

r.  Allowing Defendant Dr. Trabucco to do the procedure at Valley View Medical Center.

s.  Allowing Defendant Dr. Trabucco use of the specialized equipment to do the procedure.

t.  Failure to ensure that Dr. Trabucco was qualified and formally certified to select patients for a radical laparoscopic nephrectomy and to perform the procedure.

u.  Failure to ensure that Dr. Trabucco was credentialed and privileged for patient selection and to perform the procedure on the patient.

v.  Permitting the procedure to be performed without having proper facilities and personnel to handle the vascular complications of this procedure.

w.  Other failures to conform to accepted standards of care.

73.  Defendant Valley View Medical Center is vicariously liable for the negligence of its employees and/or agents, including Dr. Trabucco and DOES I through X.

74.  As a direct and proximate result of the Defendants' negligence, Gerald Scharf incurred economic damages.  These economic damages include, but are not limited to, hospital expenses, medical expenses and other monetary losses.  Gerald Scharf's economic damages are in an amount in excess of Seventy Five Thousand Dollars ($75,000.00).

75.  As a direct and proximate result of Defendants' negligence, Gerald Scharf incurred non-economic damages.  These non-economic damages include, but are not limited to pain, suffering, inconvenience, physical impairment, mental anguish, emotional distress,

fear of illness and other non-pecuniary damages.  Decedent Gerald Scharf's past non-economic damages are in an amount in excess of Seventy Five Thousand Dollars ($75,000.00).

## SECOND CLAIM FOR RELIEF
### (Wrongful Death Claim)

76.     Plaintiffs repeat and reallege paragraphs 1 through 75 above as though fully set forth herein.

77.     As personal representative of the estate of Gerald Scharf, Plaintiff is entitled to bring an action under the Arizona wrongful death statutes and for the wrongful death of Gerald Scharf.

78.     As a direct and proximate result of the Defendants' negligence, the heirs of Gerald Scharf have incurred economic damages.  These damages include, but are not limited to, medical, funeral and other incidental expenses in a reasonable sum, for an amount in excess of Seventy Five Thousand Dollars ($75,000.00).

79.     As a direct and proximate result of Defendants' negligence, the heirs of Gerald Scharf have incurred past and future non-economic damages.  These damages include, but are not limited to, loss of affection, aid, care, comfort, companionship, society, support, consortium and other non-pecuniary losses of a kind and loving father, mental anguish, agony and emotional distress in an amount in excess of Seventy Five Thousand Dollars ($75,000.00).

WHEREFORE Plaintiffs demand judgment against Defendants as follows:

1.     Under the First Claim for Relief, for a monetary judgment against Defendants, and each of them, for economic damages in an amount in excess of Seventy Five Thousand Dollars ($75,000.00);

2.     Under the First Claim for Relief, for a monetary judgment against Defendants, and each of them, for non-economic damages in an amount in excess of Seventy Five Thousand Dollars ($75,000.00);

3.     Under the Second Claim for Relief, for a monetary judgment against Defendants, and each of them, for economic damages in an amount in excess of Seventy Five Thousand Dollars ($75,000.00);

4.     Under the Second Claim for Relief, for a monetary judgment against Defendants, and each of them, for past and future non-economic damages in an amount in excess of Seventy Five Thousand Dollars ($75,000.00);

5.     For interest, including pre-judgment interest;

6.     For costs and disbursements incurred herein and as allowed by law; and

7.     For such other and further relief as the Court may deem just and proper.

### JURY DEMAND

Plaintiffs demand a jury of nine (9).

Dated this 22nd day of September, 2014.

Jeffrey A. Cogan, Esq., Ltd.

By: _____
Jeffrey A. Cogan, Esq.
Nevada Bar No. 4569
6900 Westcliff Drive, Suite 602
Las Vegas, Nevada 89145
*Pro Hac Vice* Attorney for Plaintiffs